**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KARI LAWMAN, | : | Civil No. 1:18-CV-01999 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| HERBERT, ROWLAND & GRUBIC, INC., | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

In this case, Plaintiff, Kari Lawman ("Lawman"), pursues claims under the Americans with Disabilities Act ("ADA") against her former employer, Defendant, Herbert, Rowland & Grubic, Inc. ("HRG"). Specifically, Lawman asserts claims for disability discrimination, failure to accommodate, and retaliation. HRG'S motion for summary judgment is pending before the court.

Because no reasonable juror could find that Lawman is a "qualified individual" with a disability, the court will grant HRG's motion and enter judgment for HRG on the disability-discrimination and failure-to-accommodate claims. At the same time, the court will deny HRG's motion on Lawman's retaliation claim. The court concludes as a matter of law that the retaliation claim is not impermissibly duplicative of the failure-to-accommodate claim, and a reasonable juror could find that Lawman is able to establish a prima facie case of retaliation.

## BACKGROUND AND PROCEDURAL HISTORY

On October 16, 2018, Lawman initiated this action by filing a complaint. (Doc. 1.)  For context, Lawman alleges the following facts.

In November 2016, HRG hired Lawman as a Financial Services Specialist. (*Id.* ¶ 13; Doc. 9, ¶ 13.)  A few months after she started, Lawman, who "suffers from major depression," notified Sandra Peters ("Peters"), a Human Resources Representative, that she had suffered a major depressive episode and required an immediate leave of absence.  (Doc. 1, ¶¶ 15, 16.)  According to Lawman, the requested leave was necessary for her "to undergo inpatient psychiatric treatment." (*Id.*)

Peters approved Lawman's request for leave.  (*Id.* ¶ 17.)  Approximately two weeks later, Lawman was admitted to a psychiatric hospital; however, rather than undergoing inpatient treatment, Lawman underwent "intensive outpatient treatment."  (*Id.* ¶¶ 18, 20.)  Lawman did not begin her treatment sooner because the facility did not have an available bed.  (*Id.* ¶ 19.)  Furthermore, she lacked insurance coverage for inpatient treatment.  (*Id.*)

Lawman averred that, from May 8, 2017 until the date of her employment termination on June 19, 2017, she was "incapable of working due to her disability."  (*Id.* ¶¶ 21, 23.)  HRG allegedly terminated Lawman from employment based on "extensive correspondence with her psychiatrist" that left HRG with no

alternatives.  (*Id.* ¶ 23.)  Nevertheless, according to Lawman, she "would have been able to return to work in full capacity" at the beginning of July 2017.  (*Id.* ¶ 24.)

In Lawman's view, HRG impermissibly terminated her employment "on account of her disability or perceived disability, in retaliation for . . . requesting an accommodation, and out of an unlawful desire to avoid providing an accommodation for [her] anticipated recovery period."  (*Id.* ¶ 25.)  Lawman further alleges that HRG – acting deliberately, willfully, and maliciously – failed to provide her with a reasonable accommodation as requested and did not engage in the interactive process.  (*Id.* ¶¶ 26, 27.)

Based on these allegations, Lawman asserts claims <u>in a single count</u> for discrimination, failure to accommodate, and retaliation under the ADA, 42 U.S.C. § 12101, *et seq.*  (*Id.* ¶¶ 28–37.)  For relief, Lawman requests back wages, front pay, and bonuses in an amount not less than $150,000.  (Doc. 1, p. 6.)[1]  Lawman also requests punitive and compensatory damages, costs, and attorneys' fees.  (*Id.*)

On December 21, 2018, HRG answered the complaint.  (Doc. 9.)  Following the close of discovery, *see* Doc. 17, HRG moved for summary judgment.  (Doc. 20.)  Along with its motion, HRG filed a supporting brief, statement of facts, and exhibits.  (*See* Docs. 21, 22, 23.)  Thereafter, Lawman timely responded with a

---

[1] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

brief in opposition, counterstatement of facts, and exhibits.  (*See* Doc. 27.)  On

January 6, 2020, the motion became ripe for review when HRG filed its reply brief,

Doc. 28, and no further filings were made or attempted.[2]

### FACTUAL BACKGROUND FOR PURPOSES OF THE PENDING MOTION[3]

### A. HRG's Hiring Of Lawman

HRG provides consulting services in civil engineering, surveying, and

environmental services.  (Doc. 22, ¶ 4.)  At all relevant times, HRG employed at

least 15 individuals.  (Doc. 1, ¶ 30; Doc. 9, ¶ 30.)  On November 16, 2016, HRG

hired Lawman as a Financial Services Specialist.  (Doc. 22, ¶ 5.)

Financial Services Specialists perform numerous tasks for HRG.  (*Id.* ¶ 8.)

Among other things, they prepare project grant and loan applications for clients.

(*Id.*)  The position of Financial Services Specialist, moreover, is within HRG's

---

[2] On November 22, 2019, the parties filed a joint motion for leave to exceed the court's page and word limits for briefs.  (Doc. 18.)  In the filing, both parties averred that excess pages and words were necessary "due to the complexity of the allegations."  (*Id.* ¶¶ 3, 5.)  On November 25, 2019, the court granted the parties' joint motion.  (Doc. 19.)  Thereafter, the parties filed their briefs. To the extent the parties meant that the facts were "complex," the court disagrees with that assertion.  Indeed, the counseled complaint only consists of 36 paragraphs, three ADA claims in a single count, and six pages.  (Doc. 1.)  And, in its briefing, HRG actually refers to the facts as "simple" and "extremely simple."  (Doc. 21, pp. 10, 16; Doc. 28, p. 4.)  The court also notes that the parties incorporated their statements of facts by reference and devoted large portions of the briefs not to the facts, but to recitations and interpretations of other cases.  Similarly, the court seriously questions whether the legal issues in the case – if that is what the parties intended by "allegations" – are "complex."  The court only mentions these items to ensure that counsel exercises appropriate caution before requesting similar relief from page and word limits in the future.

[3] In this section, the court relates both disputed and undisputed facts.  When the court relates disputed facts, it does so consistent with the standard of review, *infra*.

Financial Services Division (the "Division").  (*See id.* ¶¶ 6, 7.)  The Division is a highly specialized group.  (*Id.* ¶ 12.)  Employees within the Division receive extensive and specialized training to be able to complete their duties.  (*Id.*)  The training regimen typically takes one to two years to complete.  (*Id.* ¶ 13.)

During her tenure, Lawman's direct supervisor was Adrienne M. Vicari ("Vicari").  (Doc. 22, ¶ 6.)  Vicari served as the Practice Area Leader for the Division.  (*Id.*)  Upon starting her employment, Lawman immediately began the training required for Division employees.  (*Id.* ¶ 14.)  Kaye Goodman ("Goodman") was responsible for training Lawman.  (*Id.* ¶¶ 23–24.)

During the training, Lawman provided support to Goodman.  Lawman's work mostly involved reviewing reports that had already been completed.  (*See id.* ¶ 24; Doc. 23-2, p. 11.)  The purpose of the training was for Lawman to be able to compile and interpret relevant data on her own so that she could complete necessary reports and provide direct financial services to clients.  (*See* Doc. 22, ¶ 7; Doc. 23-2, p. 11.)

As a Financial Services Specialist, Lawman's primary client was the Office of Budget at the Commonwealth of Pennsylvania.  (Doc. 22, ¶ 16.)  The Commonwealth was also the Division's largest client.  (*Id.* ¶ 17.)  The Commonwealth hired HRG to complete compliance monitoring of projects being handled by grantees receiving state funds.  (*Id.* ¶ 18.)

## B. HRG's Employee Handbook Regarding New Hires And Use Of Leave

HRG has an Employee Handbook (the "Handbook") that Lawman received and reviewed at the start of her employment.  (*See id.* ¶¶ 27–28.)  The Handbook included policies about new hire introductory periods and the use of leave.  (*Id.* ¶ 27.)

Regarding the former topic, the Handbook provided that new hires must complete a 180-day introductory period to allow for the new employee and HRG to "become acquainted."  (*Id.* ¶ 29.)  During that period, a new hire could be terminated from employment if the new hire failed "to demonstrate an acceptable level of performance or behavior."  (*Id.* ¶ 30.)

Concerning leave, HRG had a personal leave policy under which employees were offered a personal leave of absence without pay after completing six months of continuous service.  (*Id.* ¶ 32.)  Unless other arrangements were made, the Handbook further required employees to notify their "immediate supervisor . . . by 8:00 a.m. each and every morning" that the employee would not be reporting to work.  (*Id.* ¶ 35.)

## C. Lawman's Personal Leave Of Absence

On May 8, 2017, just shy of six months after she started and before she completed the training, Lawman did not report to work or notify Vicari that she would be absent.  (*Id.* ¶¶ 31, 33, 36–37.)  Lawman had experienced a mental

breakdown and drove from Pennsylvania to her son's house in Georgia.  (Doc. 23-2, pp. 16, 18.)  According to Lawman, she was "out of [her] mind" at the time.  (*Id.* at 32.)

HRG's first contact with someone about Lawman's absence came in the form of a voicemail from Lawman's husband.  According to the voicemail, which was left for Vicari, Lawman's husband stated that "he and [Lawman] got into a fight and [that he] c[ould not] find her."  (Doc. 23-8 at 3.)  Vicari forwarded the voicemail to HRG's Human Resources Department.  (Doc. 22, ¶ 39.)  Someone from the Human Resources Department, in turn, called Lawman's husband and asked him to have Lawman call as soon as possible.  (*Id.*)

Later that day, Lawman's son or mother used her phone to e-mail Vicari and HRG's Director of Human Resources, Laura Williams.  (*Id.* ¶ 41; Doc. 23-3, p. 44.)  The author of the e-mail wrote that Lawman was "under medical attention" and would "need to seek short-term medical disability."  (Doc. 22, ¶ 42.)  The author of the e-mail also requested "forms for the doctors to fill out."  (*Id.*)

Within 40 minutes, HRG, through Peters, a Senior Human Resource Specialist, replied to the e-mail and asked Lawman to call.  (*Id.* ¶ 46.)  Approximately one hour later, Lawman's mother replied, stating that Lawman was "not able to talk about things right now."  (*Id.* ¶ 47.)  Despite Lawman failing to

comply with the Handbook's absentee-notification policy on that day, HRG did not take adverse action against Lawman.  (*Id.* ¶ 40.)

The following morning, on May 9, 2017, Lawman e-mailed Peters.  (*Id.* ¶ 48.)  Lawman wrote that she was "being formally admitted th[at] morning" and would "be unavailable for several days."  (*Id.*)  Within hours, Peters replied.  (*Id.* ¶ 51.)  Peters wrote that HRG would grant Lawman a personal leave of absence since she was not eligible for FMLA leave.  (*Id.* ¶¶ 34, 51.)  HRG also granted personal leave to Lawman even though she had not worked the required six continuous months to be eligible for leave under the policy in the Handbook.  (*Id.* ¶¶ 33, 53.)  Peters attached to her e-mail reply forms for Lawman to review, complete, and return.  (*Id.* ¶ 52.)  The forms were to allow Lawman to make a formal personal leave request and apply for short-term disability benefits.  (*Id.*)

On May 11, 2017, two days after Peters replied to Lawman's e-mail, Lawman responded.  (*Id.* ¶ 54.)  Lawman wrote that she would return the forms "[a]s soon as [she could] print [them]."  (*Id.*)  Lawman also stated that she was "trying to . . . come back to work no later than June 5."  (*Id.*)  Within five minutes, Peters again replied.  (*Id.* ¶ 55.)  This time, Peters told Lawman to let her (Peters) "know if [she could] assist . . . in any way."  (*Id.*)

For the 18 days that followed, Lawman did not communicate directly with HRG.  (*See* Doc. 23-2, p. 23.)  During that period, however, she communicated

with Josh Dicks, HRG's third-party-benefits administrator.  (*See* Doc. 27-2, p. 4;
Doc. 27-3, p. 2.)  Still, as of May 30, 2017, even though Lawman did not
technically qualify or provide proof that she was under medical care, HRG
continued to grant her a personal leave of absence.  (Doc. 22, ¶ 67; Doc. 27-1, ¶
67.)

On May 30th, Peters reached out to Lawman through e-mail.  (Doc. 22, ¶
68.)  In the e-mail, Peters noted that she had not received the forms that she
previously e-mailed to Lawman.  (*Id.*)  Peters also stated that further
communication from Lawman was necessary to continue to approve her personal
leave of absence and hold her position.  (*Id.*)  In addition, Peters asked Lawman or
her medical provider to forward "documentation that [she] [was] under his / her
care and the duration he / she expects you will be unable to work."  (*Id.*)

On June 1, 2017, Lawman replied with the completed leave forms.  (*Id.* ¶
69.)  On the personal leave request form, and upon the advice of her medical
provider, Jeremy Walters, M.D. ("Dr. Walters"), Lawman requested leave until
June 21, 2017.  (Doc. 22, ¶ 71; Doc. 23-3, p. 55.)  Dr. Walters also sent a letter to
Peters on the same date (June 1st).  (Doc. 23-3, p. 56.)

In the June 1 letter, Dr. Walters advised Peters that Lawman would undergo
treatment until July 14, 2017.  (Doc. 23-3, p. 56.)  On July 14, 2017, Dr. Walters
planned to reevaluate Lawman.  (*Id.*)  Dr. Walters also advised Peters that Lawman

was admitted to a treatment program on May 19, 2017 – not May 8 or 9, as HRG

believed based on past correspondence with Lawman and her relatives.  (*Id.*; *see*

Doc. 22, ¶¶ 42, 48.)

In response to Dr. Walters' letter, Peters twice followed up with Lawman

requesting proof of medical treatment from May 8 through 19, 2017.  (Doc. 22,

¶ 75.)  According to an e-mail from Peters to Lawman dated June 2, 2017, Peters

left voicemails for Lawman.  (*Id.* ¶ 76.)  Peters further wrote that if HRG failed to

receive "documentation from [Lawman's] physician stating [she was] under his /

her (sic) care since May 8, 2017," along with an expected return date, Lawman's

group health benefits would lapse on June 7, 2017.  (*Id.*)

Approximately four hours later, Lawman replied to Peters' e-mail,

referencing that Dr. Walters' letter had been faxed and e-mailed.  (Doc. 23-3, p.

57.)  Lawman also believes that she tried returning Peters' phone calls and

subsequently followed up on June 5th to ask whether Dr. Walters' letter had been

received.  (*Id.*; *see* Doc. 23-2, p. 27.)

On June 6, 2017, Peters sent another e-mail to Lawman.  (Doc. 22, ¶ 77.)

Peters confirmed receiving Dr. Walters' letter.  (*Id.*)  But because Peters had not

received documentation showing that Lawman was being treated from May 8

through 19, 2017, Peters requested Lawman to send such documentation

immediately.  (*Id.*)

As it turned out, on May 8th and 9th, Lawman was not admitted to any treatment programs or seen by physicians; therefore, she was unable to provide records evidencing that she received any treatments or diagnoses prior to May 19, 2017.  (*Id.* ¶ 78; *see* Doc. 23-2, pp. 16, 19, 32.)  At the time, based on information she acquired while talking to a facility over the phone, Lawman nevertheless believed that she was going to be admitted sooner than May 19th.  (Doc. 23-2, p. 20.)  But due to a lack of available beds, Lawman could not be admitted earlier. During that time period, Lawman was only able to speak with counselors over crisis lines.  (*Id.*)  Dr. Walters supported Lawman's position that she had attempted to be admitted to a program earlier than May 19, 2017.  (Doc. 23-3, p. 56; *see also* Doc. 23-8, p. 2.)

 Despite failing to receive documentation from Lawman concerning treatments or diagnoses before May 19, 2017, HRG sent Dr. Walters an ADA Questionnaire.  (*See* Doc. 22, ¶ 80.)  The purpose of the Questionnaire was to determine the nature of Lawman's medical issue and potential accommodations. (*Id.*)  On June 16, 2017, Dr. Walters returned a copy of the completed Questionnaire.  (*Id.* ¶ 81.)

In the completed Questionnaire, Dr. Walters revealed that Lawman had anxiety and depression, which made it difficult for her to concentrate such that she could not work.  (*Id.* ¶ 82.)  Dr. Walters further explained that he did not know if

Lawman would require additional leave, but he planned to make a determination on July 14, 2017 – the date scheduled for Lawman's reevaluation.  (*See* Doc. 23-3, pp. 56, 64.)  Finally, Dr. Walters did not make any suggestions regarding possible accommodations for enable Lawman to resume working.  (*Id.* at 64.)

### D. The Division's Backlog Of Work

Before HRG hired Lawman, the Division already maintained a backlog of work.  (*See* Doc. 23-4, p. 7.)  The backlog further developed at the beginning of 2017, due, in part, to the Division's sale of more work within the first half of that year than in any previous year.  (*See id.*; Doc. 22, ¶¶ 21–22.)  Indeed, by May 2017, the Division was months ahead of schedule in terms of sales, having already met its annual target.  (*Id.* ¶ 21.)  To compound matters, the Division had also been understaffed.  (*Id.*)

When HRG hired Lawman, one other individual, Ryan Brockman ("Brockman"), held the title of Financial Services Specialist.  (Doc. 27-1, ¶ 9.)  Of course, as mentioned, another employee, Goodman, had training and could perform the job functions of a Financial Services Specialist.  (*See* Doc. 23-4, p. 13.)  Also, other employees already working for HRG were able to perform some of the functions performed by Financial Services Specialists.   (*See id.* at 13–14; *see also* Doc. 23-7, p. 2.)  Still, only two people working for HRG held the title "Financial Services Specialist."  In April 2017, that changed.

One month before Lawman went on personal leave in May 2017, Brockman
left HRG.  (Doc. 22, ¶ 10.)  Thus, Lawman, who was not fully trained and had not
worked six months for HRG, became HRG's only remaining Financial Services
Specialist.  (*See* Doc. 27-1, ¶ 57.)  Once Lawman went on leave in May 2017,
HRG had no other "Financial Services Specialists" and was faced with an existing
backlog of work.

In June and July 2017, HRG eventually hired two individuals, including a
new Financial Services Specialist to replace Brockman.  (*Id.* at ¶ 94; Doc. 22, ¶ 94;
*see* Doc. 23-4, p. 15.)  And despite threats from the Commonwealth about the
Division's backlog of work, the Division maintained the Commonwealth as its
largest client. (*See* Doc. 23-4, p. 15; Doc. 27-1, ¶¶ 57–59.)

## E.  Lawman's Employment Termination

On June 19, 2017, HRG advised Lawman that it had to terminate her
employment.  (Doc. 22, ¶ 88; *see* Doc. 27-4.)  According to HRG, it terminated
Lawman "[d]ue to the fact that [her] leave request was . . . open-ended and
'unknown'" and "placed an undue burden" on the company.  (Doc. 22, ¶¶ 88, 90.)
HRG was also "concern[ed]" about "turnover . . . because of asking people to
continuously work more."  (*Id.* ¶ 91.)  Although she was making progress before
HRG terminated her employment, Lawman's disability precluded her from

returning to work until she was discharged from her treatment program two months later, on or about August 21, 2017.  (*See* Doc. 23-2, pp. 30–31, 33–34.)

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.*  "A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249.  Instead, the

court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks and citation omitted); *see also* Fed. R. Civ. P. 56(c)(4) (establishing requirements for affidavits or declarations filed in support of or opposition to a motion for summary judgment). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)). "In this respect, summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

15

Moreover, the court is not required to go on a fishing expedition in search of relevant evidence.  The court must only consider the evidence that the parties cite to in their summary-judgment filings.  Fed. R. Civ. P. 56(c)(3).

Summary judgment will generally be appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### DISCUSSION

As mentioned, Lawman asserts claims under the ADA for disability discrimination, failure to accommodate, and retaliation.  On summary judgment, HRG <u>first</u> contends that Lawman cannot establish that she is a "qualified individual" for purposes of satisfying the second element of a prima facie disability-discrimination claim.  (Doc. 21, p. 10.)  In that vein, HRG, argues that Lawman's purported request for an "unknown" amount of leave was not reasonable as a matter of law and placed a significant undue burden on the

16

business.  (*Id.* at 10–22; 24–31.)  <u>Second</u>, HRG asserts that it engaged in the interactive process with Lawman and, thus, did not fail to provide reasonable accommodations for her disability.  (*Id.* at 22–24.)  <u>Third</u>, HRG contends that the retaliation claim is impermissibly duplicative of Lawman's failure-to-accommodate claims, and, in any event, Lawman cannot demonstrate a prima facie case of retaliation.  (*Id.* at 31–34.)  The court will address these arguments in the following subsections.

### A. No Reasonable Juror Could Find For Lawman On Her Disability-Discrimination Claim.

In relevant part, the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To establish a prima facie case of disability discrimination, the employee must establish that she (1) has a disability; (2) is a qualified individual; and (3) suffered an adverse employment action because of her disability.  *Hohider v. UPS, Inc.*, 574 F.3d 169, 186 (3d Cir. 2009).

Here, HRG does not contest that Lawman has a disability or that she was terminated because of her disability.  HRG, instead, focuses on the second, qualified-individual element.

With respect to the second element of the prima facie case for disability discrimination, the ADA defines "qualified individual" as someone who, "with or without reasonable accommodation, can perform the essential functions of the [job] that such indivi dual holds or desires." 42 U.S.C. § 12111(8). To determine whether a person falls within that definition, the court considers two factors.

First, the court considers whether the employee had the appropriate prerequisites for the job she held or desired. *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). Second, the court considers whether the employee was able to perform the essential functions of the job, with or without reasonable accommodation. *Gaul*, 134 F.3d at 580; *see* 42 U.S.C. § 12111(8) ("[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential.").

The parties do not argue about whether Lawman had the appropriate prerequisites for the job that she held, as Financial Services Specialist. The parties' arguments, instead, turn on whether Lawman could perform the essential functions of her job with or without a reasonable accommodation. More precisely, the parties disagree about whether Lawman's request for personal leave, via Dr. Walters' responses in the ADA Questionnaire, was reasonable as a matter of law.

Under the ADA, a "reasonable accommodation" may include, among other things, job restructuring, modified work schedules, or an adjustment or

18

modification to policies.  *See* 42 U.S.C. § 12111(9)(B).  A leave of absence may also constitute a "reasonable accommodation," but only under certain circumstances.  *Carpenter v. York Area United Fire & Rescue*, No. 18-2155, 2020 WL 1904460, at *6 (M.D. Pa. Apr. 17, 2020) (citing *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 151 (3d Cir. 2004)).  As a matter of law, to be considered a reasonable accommodation, a request for leave "cannot be indefinite or open-ended; there must be some expectation that the employee could perform his essential job functions in the 'near future' following the requested leave."  *Id.*

HRG contends that Lawman's request for leave, through Dr. Walters' response on the completed ADA Questionnaire, was not reasonable as a matter of law.  In HRG's view, that is because the request was indefinite and open-ended.  (*See* Doc. 21, pp. 10, 16, 20–22 & n.1.)  The court agrees and finds that no reasonable juror could reach the opposite conclusion about the characterization of the request.

In the completed ADA Questionnaire, Dr. Walters did not indicate when Lawman's treatment would conclude or when she might be able to return to work to perform the essential functions of her job.  Dr. Walters also did not know at the time how much leave Lawman would require beyond the leave HRG already gave her.  (Doc. 23-3, pp. 56, 64.)  Rather, Dr. Walters merely indicated his intent to

reevaluate those questions on July 14, 2017.  But even then, there were no

assurances that he would, in fact, be able to make a determination by that date.

When HRG received the completed ADA Questionnaire from Dr. Walters,

the five weeks of leave that HRG had already provided Lawman was gratuitous.

She did not qualify for leave under HRG's policies.  Nor did she qualify for leave

under the FMLA.  The record evidence also demonstrates that HRG provided

gratuitous leave to Lawman with little insight into, and no records regarding, her

condition or status.  Thus, upon receiving the ADA Questionnaire, which does not

provide any clarity on when Lawman might have been able to return to work, HRG

was not required to wait until the noted reevaluation date before making a decision

on whether to hold Lawman's position open.

Lawman testified during her deposition that she was getting better before she

learned of the termination decision.  However, as the court understands the facts,

as presented by the parties, neither Lawman nor her medical provider informed

HRG about such progress until her deposition.  Lawman instead remained on leave

(and in a treatment program) through the termination date.  Moreover, she ended

up remaining in her treatment program for more than one month beyond the

reevaluation date.

On these facts, a reasonable juror could only conclude that the request was

open-ended and indefinite as of the termination date.  The request is unreasonable

as a matter of law, *see Carpenter*, 2020 WL 1904460, at *6 (citing *Conoshenti*, 364 F.3d at 151), and, thus, a reasonable juror could not find that Lawman is able to prevail on the second element of her prima facie case.  The court will enter judgment for HRG on Lawman's disability-discrimination claim.[4]

### B.  The Court Will Permit Lawman's Retaliation Claim To Proceed.

The ADA prohibits retaliation.  In relevant part, the ADA expressly provides that no "person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."  42 U.S.C. § 12203(a).  To establish a prima facie case of ADA retaliation, the employee "must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."  *Williams v.*

---

[4] Because the elements of disability discrimination and failure to accommodate are the same, the court dispenses with a separate discussion of the latter claim that Lawman raises and whether HRG failed to engage in the interactive process.  *See Vought v. Twin Tier Hosp., L.L.C.*, No. 18-1113, 2019 WL 2501470, at *6 (M.D. Pa. June 17, 2019) (observing that the elements are "identical" and that an "employer's refusal to make reasonable accommodations for an employee's disabilities or failure to engage in [the interactive process] both constitute adverse employment actions.") (quoting *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010) (internal citation omitted)).  To that end, Lawman cannot prevail without demonstrating that she is a qualified individual, which, as discussed, she does not do.  *See id.*  Accordingly, the court will also enter judgment for HRG on Lawman's failure-to-accommodate claim.

*Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004) (internal

citations and quotation marks omitted).

Assuming that the employee satisfies her prima facie burden, the analysis

does not end there.  That is because "the burden-shifting framework of *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to ADA retaliation claims."

*Gardner v. Sch. Dist. of Phila.*, 636 F. App'x 79, 85 (3d Cir. 2015) (citing *Shaner*

*v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000)).  Thereunder, the burden of

production shifts between the employee and the employer, while the burden of

persuasion always remains with the employee.  *Gardner*, 636 F. App'x at 86

(citing *Shaner*, 204 F.3d at 500–01 (internal citation omitted)).

Accordingly, under the *McDonnell-Douglas* framework, after the employee

satisfies her burden of demonstrating a prima facie case of retaliation, "the burden

shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse

employment action." *Id.* (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500

(3d Cir. 1997)).  The opposing party's burden of production at this stage is

"relatively light: it is satisfied if the [employer] articulates any legitimate reason

for the adverse employment action."  *Id.*  Thereafter, if the employer satisfies its

burden, "the burden shifts back to the employee, who then must 'prove by a

preponderance of the evidence that the legitimate reasons offered by the

[employer] were not its true reasons, but were a pretext for discrimination."  *Id.*

(quoting *Shaner*, 204 F.3d at 500 (internal citation omitted)) (alteration in original).

In moving for summary judgment on Lawman's retaliation claim, HRG raises two arguments: (1) the claim is duplicative of the failure-to-accommodate claim and, thus, should not be considered; and (2) Lawman cannot meet her prima facie burden.  (Doc. 21, pp. 32–34.)

### 1. The Retaliation Claim Is Not Duplicative Of The Failure-To-Accommodate Claim.[5]

According to HRG, Lawman "makes no averment to provide any basis for the retaliation claim other than she was denied an accommodation and was therefore unable to return to work."  (Doc. 21, p. 32.)  As a result, HRG argues that this court should adhere to *Garner v. School District of Philadelphia*, 63 F. Supp. 3d 483 (E.D. Pa. 2004)[6] and *Williams v. Philadelphia Housing Authority*, 230 F.

---

[5] In her brief in opposition, Lawman fails to address HRG's argument regarding the purported duplicity of her retaliation claim.  (Doc. 27, pp. 26–27.)  Because of this, the court could deem the issue unopposed and/or the claim abandoned, and award summary judgment to HRG.  *See Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F. Supp. 3d 541, 556 (M.D. Pa. 2014) (collecting cases) ("[A] non-movant's failure to offer any response to an opposing party's summary judgment arguments constitutes an abandonment of claims left undefended."); *Mills v. City of Harrisburg*, 589 F. Supp. 2d 544, 558 n. 15 (M.D. Pa. 2008) (deeming claims to be "abandoned" and granting summary judgment to defendants when counsel failed to respond to arguments raised against those claims) (citations omitted).  The court, however, will not do so in this situation, where it is clear to the court that HRG's argument is flawed.

[6] On appeal, the employee's name appears to have been spelled differently (Gar<u>d</u>ner) in the caption.

Supp. 2d 631 (E.D. Pa. 2002), and dismiss the "repackaged" retaliation claim. (Doc. 21, pp. 32–33.)  The court disagrees with HRG.

Initially, in *Williams*, the district court and the Third Circuit addressed the merits of the employee's failure-to-accommodate <u>and</u> retaliation claims.  *See Williams*, 380 F.3d at 758–74; *Williams*, 230 F. Supp. 2d at 637–47.  Likewise, in *Gardner*, the Third Circuit affirmed the district court's summary judgment order on the merits, concluding that summary judgment was proper because the employer "ended his argument at the prima facie step," without addressing his burden at the third (pretext) step.  636 F. App'x at 85–87.  Given these merit-based decisions, any argument "that failure[-]to[-]accommodate and retaliation claims can never be pursued in the same case" is seriously undermined.  *Sharbaugh v. West Haven Manor, LP*, No. 14-1723, 2016 WL 6834613, at *25 (W.D. Pa. Nov. 21, 2016).

Also, in *Williams*, the District Court did not at all consider the employee's "second incident of retaliation" to be "circular or redundant of" the employer's other claims.  *Id.*  With respect to the "second incident," the employee claimed retaliation for being terminated after requesting a transfer.  *Id.* (citing *Williams*, 230 F. Supp. 2d at 640–42); *see also Williams*, 380 F.3d at 759 ("Williams argues on appeal that PHA terminated him in retaliation for his request for reassignment

. . . as a reasonable accommodation.").  This is particularly noteworthy in light of the court's understanding of Lawman's retaliation claim.

Like the "second incident" of retaliation in *Williams*, the court understands Lawman's theory of retaliation – however inartfully pleaded – to be that the act of retaliation at issue is that she was <u>terminated</u> by HRG after requesting a leave of absence.  In other words, her theory is not that the act of retaliation was the denial of her request for an accommodation.  In that regard, in paragraph 25 of the complaint, Lawman alleges the following: "Accordingly, it is believed and therefore averred that Defendant <u>terminated</u> plaintiff's employment . . . in retaliation <u>for</u> Plaintiff's <u>requesting an accommodation</u> . . . ."  (Doc. 1, ¶ 25) (emphasis added.)  Furthermore, in Count I, she incorporated paragraph 25 by reference and made it clear that she intended to pursue a claim for "retaliation." (*Id.* at p. 5 & ¶ 28.)

Provided this understanding of Lawman's retaliation claim, coupled with how the courts in *Gardner* and *Williams* addressed the retaliation claims in those cases, the court declines HRG's invitation to dismiss the retaliation claim for being redundant or impermissibly duplicative of the failure-to-accommodate claim.  *See also Vought*, 2019 WL 2501470, at *7 (rejecting the argument that employee's retaliation claim was a reiteration of failure-to-accommodate claim where the employee "identified adverse employment decisions beyond [the employer's]

denial of his accommodation request.") (citation omitted).  In kind, the court will

address the merits.

### 2.  A Reasonable Juror Could Conclude That Lawman Establishes A Prima Facie Case Of Retaliation.[7]

To establish a prima facie case of ADA retaliation, an employee is not

required to prove that she is a "qualified individual."  *Kieffer v. CPR Restoration &*

*Cleaning Serv., LLC*, 200 F. Supp. 3d 520, (E.D. Pa. 2016) (quoting *Krouse*, 126

F.3d at 502).  Rather, as mentioned, the employee need only show: "(1) protected

employee activity; (2) adverse action by the employer either after or

contemporaneous with the employee's protected activity; and (3) a causal

connection between the employee's protected activity and the employer's adverse

action."  *Williams*, 380 F.3d at 759.

The court does not read HRG's arguments on the merits to concern the first

or second elements.[8]  Rather, HRG focuses its argument on demonstrating that

---

[7] On the merits, HRG only moves for summary judgment on the ground that Lawman "cannot sustain a prima facie claim of retaliation."  (Doc. 21, pp. 3, 33; *see also* Doc. 28, pp. 18–19.)  In reciting the so-called "retaliation standard," HRG does not mention the *McDonnell-Douglas* framework or burden-shifting responsibilities.  (Doc. 21, p. 31; *see also* Doc. 28, pp. 18–19.)  It solely focuses on the elements that an employee must prove to establish a prima facie case and then purportedly "illustrate[s]" why Lawman cannot meet her prima facie burden.  (Doc. 21, pp. 31, 33; *see also* Doc. 28, pp. 18–19.)  Because the court does not view HRG's arguments to address the second or third steps under *McDonnell Douglas*, the court will not address those steps in this memorandum.

[8] Regardless, a reasonable juror could find that Lawman could satisfy both elements.  With respect to the first element, a protected activity "includes a good-faith request for accommodation," *Vought*, 2019 WL 2501470 at *6 (citing *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010) (internal citation omitted)), which necessarily includes, a good-

Lawman cannot satisfy the third element requiring a causal connection between the employee's protected activity and the employer's adverse action.  HRG, however, fails to take into account the timing of the events.

With respect to the third (causation) element, timing alone "ordinarily is insufficient to demonstrate a causal link unless the timing is 'unusually suggestive' of retaliatory motive."  *McLaughlin v. Fisher*, 277 F. App'x 207, 218 (3d Cir. 2008) (quoting *Krouse*, 126 F.3d at 503 (internal citation omitted)).  By way of example, the Third Circuit has "held two days between a protected activity and an adverse action is 'unusually suggestive' . . . but that three months is not."  *Id.* (citing *Krouse*, 126 F.3d at 503 (internal citation omitted); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007)).  "Where the time between the protected activity and adverse action is not so close as to be unusually suggestive . . . , courts may look to the intervening period for 'demonstrative proof, such as actual antagonistic conduct or animus against the employee . . . or other

---

faith request for leave or additional leave, *Solwell v. Kelly Servs., Inc.*, 139 F.Supp.3d 684, 702 (E.D. Pa. 2015) (citing *Sulima*, 602 F.3d at 188).  Because an employee is not required to prove that she is a "qualified individual" to make out a prima facie case, the court does not equate "good-faith" with "reasonable."  Here, Lawman clearly requested an accommodation for leave. But, more importantly, viewing the evidence in her favor, a reasonable juror could conclude that her leave request and requests for additional leave were made in good faith.  Indeed, regardless of whether the requests were "reasonable," the evidence reflects that Lawman requested leave due to an emergency medical episode for which she participated in a treatment program. It is also indisputable that Lawman's termination qualifies as an adverse employment action that occurred after she engaged in the protected activity.  Thus, Lawman could easily satisfy the second prima facie element.

types of circumstantial evidence." *Kieffer*, 200 F. Supp. 3d at 536 (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007), *as amended*, (Aug. 28, 2007) (internal citation omitted)).

On June 19, 2017, HRG terminated Lawman's employment.  (Doc. 22, ¶ 88; *see* Doc. 27-4.)  According to HRG, Dr. Walters' June 16, 2017 response in the ADA questionnaire – that it was "unknown" whether Lawman required additional leave – is the governing request in this case.  (*See* Doc. 21, p. 10 & n.1.)  If so, there would only be three days between the protected activity and adverse action. That small amount of time alone would make the termination decision "unduly suggestive" of retaliatory motive.  *See McLaughlin*, 277 F. App'x at 218 (citing *Krouse*, 126 F.3d at 503 (internal citation omitted); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007)).

Lawman nevertheless suggests that some request made "thirteen (13) days" prior to her termination is what actually governs.  (Doc. 27, p. 27.)  The court is not sure which request Lawman refers to.  Perhaps she is referring to when she returned the leave forms to Peters on June 1, 2017, and requested leave until June 21, 2017.  Assuming that to be the case, there would still only be an 18-day period between the protected activity and adverse action.  Even under that range, the timing for purposes of a retaliation claim would be "unusually suggestive" of retaliatory motive, permitting a reasonable juror to find that Lawman could

establish causation.  And because HRG does not appear to contest the other two elements of a retaliation claim, the court will not enter summary judgment for HRG.

## CONCLUSION

For the foregoing reasons, the court will grant in part and deny in part HRG's motion for summary judgment.  (Doc. 20.)  In granting the motion, the court will enter judgment for HRG on Lawman's disability-discrimination and failure-to-accommodate claims.  In denying the motion, the court allow the retaliation claim to proceed, and will schedule a conference call with the parties for the purpose of setting the retaliation claim for a trial.  An appropriate order will follow.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: September 8, 2020